Thanks. We're ready to begin. Call our first case. United States v. Chandler. Good morning. May it please the court. My name is Abigail Horn and I represent the appellant James Chandler. May I please reserve three minutes for rebuttal? Yes, you may. And I may need you to speak up just a little bit, if you would, please, Ms. Horn. Yes. We're here on three errors. First, the offense of conviction was not motivated by status. Second, the dangerous weapon commentary to the sentencing guidelines violates NACIR. And third, the same phrase dangerous weapon in robbery of mail matter 2114 does not include a fake gun. Beginning with the offense of conviction, that phrase means the conduct charged in the count of the indictment of which the defendant was convicted. Hear the kidnapping. You got the court's request that you be prepared to speak about Murillo, right? Yes. OK, well, why don't you dive in on that, if you would, please, and explain to us if Murillo's got any traction, whether it in fact means that it doesn't just we don't have to focus strictly on the elements of the offense of conviction. We can pay attention to conduct which is in furtherance of or related to it in a meaningful way. Thank you, Judge Jordan. There's two things about Murillo. First, Murillo is very helpful in that it's only focused on one specific count in Murillo. What the court says is tell us about the PSR facts related to the crack in the filing cabinet. It doesn't say you can look for five participants in the structuring count or in the marijuana in the Chevy Blazer. And if we're focused on the kidnapping here, the rationale in Murillo is also important, because it says the reason we go to the PSR is we can't determine role from the elements as a practical necessity. We have no choice. But for kidnapping, that's not the case. Kidnapping can either be well engaged in or on account of official duties. And so we know here the government only charged well engaged in there isn't the necessity to go beyond the elements. So you're saying we really are stuck with exactly what was charged. It doesn't make any difference that this was all obviously one continuous course of conduct. I mean, that's what I hear. So we hear from the briefing from your opponents in the U.S. Attorney's Office. They say, look, you can't this is this is all one thing. You can't unwind this. He he robbed her and then said and then at gunpoint made her drive him to where he wanted to go for his getaway. And that's one continuous course of conduct. It's not like, oh, and this stopped and this started. What's your what's your response to that? Well, my response will be to refer to 1B1.2, the text which defines the offense of conviction and uses the words charge in the count of the indictment. So it's referring us to a specific count. And again, as I said, the facts of Murillo are also focused on one count to make sure I understood. Your response to the government is so what? So what? That it all happened at once. It was all one thing. It was not a discreet event. And clearly it was in furtherance of the robbery because it was part of the whole. It was the getaway. Your answer is no. Look at 1B1 and that's it. Well, I think we win either way. And I also think there was a flip there. So then explain to me how you win either way. OK, could I please just respond to one thing in your question? So the kidnapping was in furtherance of the robbery and Murillo is the opposite. What facts are in would be in furtherance of the kidnapping. So I think there's a. I think you could say that the that the the robbery and the and the kidnapping are or at least I hear them saying you can't really say one's in furtherance of the other one direction or the other because it's all one thing. That's and you say we can win anyway, even if we look at it that way. Please, please explain. Yeah, sure. Your honor. So if we look at the robbery, the government says, you know, let's look let's look at the robbery. Let's look at the PSR when we see from from the facts of the cases that Mr. Chandler took packages from mail carriers. He also took packages off of porches. He also I could have emphasized this more in the brief took seven dollars from one of the mail carriers himself. So this is a crime motivated by greed, by, you know, maybe more charitably economic necessity or drug addiction. But this is somebody who's interested in money. This isn't somebody who has a grudge against the government is trying to impede the government to retaliate against the government. This is somebody who needs seven dollars. However, he's going to get it. That's a motivation argument. Yes. Yeah. Now, Pressler, you know, Pressler suggests a broader. Sorry. A reading that's maybe broader than the government's, but narrower than yours. And footnote seven, it talks about offensive conviction includes only the facts undergirding the specific offense which the defendant was convicted. So it doesn't suggest that we're confined to say what the indictment recites or charges. Right. So I think Pressler would allow us to go to the guilty plea colloquy. So in that case, the indictment charges kidnapping for a personal benefit. We can go to the guilty plea colloquy and see that the personal benefit was a ride of about a mile. And that would be fine under Pressler and Pressler. They say we're you know, we're bound by the verdict distribution, not distribution resulting in death. And we're fine with that. Pressler. And I think also Boney shows that sometimes this benefits the government. So Boney, you know, relying on Pressler says you're bound by the indictment. The indictment charges attempted murder with the intent to retaliate, not obstruction of justice. And in that case, the government wins because the court relies on the trial testimony to say that the most appropriate guideline is obstruction. Well, they say that you're overreading Boney, that it doesn't it doesn't really restrict the government in the fashion that you're saying it does. You address that a little bit in the reply brief, but you want to take that head on? Well, I think that Boney is interpreting this same phrase that we rely on, 1B1.2, the count of the indictment. And it says that the court errs by relying on the trial testimony instead of the indictment. It says what you do is you read the indictment. You look and see what was charged the same way here. It's charged kidnapping while engaged in official duties. Kidnapping it charged in Boney, it charged attempted murder for the purpose of retaliation, not obstruction for the purpose of retaliation. I understand the argument that we're not going to take motive from one offense and simply transplanted onto another without doing an analysis of what the motive was for the offense of conviction. But when we're looking at the offense of conviction, kidnapping, why can't we take account of the facts, the conduct that would normally inform whether somebody had a particular motive? And that would include things that preceded it. Take out the robbery charge. Assume it wasn't even charged. If we had facts coming in that were the sort of background to why the kidnapping happened, any trier of fact would take account of those to ascertain motive. Why should we be precluded from doing that or district court precluded from doing that under the guidelines? Well, I think I've hopefully given my best answer, which is to rely on the text 1B 1.2, which defines that phrase to point out, you know, the cases that interpreted that say, you know, we look at the indictment. And the only reason we go past the indictment in Murillo is because we can't tell it from the elements here. We can tell from the evidence from the elements. And frankly, the government indicted this properly. If you look at all the facts, it doesn't support an on account of charge. And I see the court's resistance. If I could just say a little bit more about the robbery, we give you the immigration cases, which I think are extremely analogous here. For example, Posada, where there's somebody who comes in and says, I was persecuted for being a union leader. I had control of the budget. They came. They said, we know you have this money and was extorted for it. And the court says, that's not about status. That's not about being a union leader. That's about greed. And we have the same thing here. Well, does the motive have to be some anti-government animus? Are you suggesting that for this enhancement to apply, there has to be, it's not enough that there was a motive to rob the Postal Service. It had to be a particular kind of motive to want to rob the Postal Service? I don't think just an economic motive is ever going to satisfy the statute. Well, it may not be just an economic motive. I mean, we can't, like, completely fathom what was in the guy's head. But he was wearing a United States Postal Service sweatshirt. He robs these two Postal Service workers, not just, you know, randomly one after another. But there's one, and then there's a month or two, and then there's another. It appears that, you know, he could have robbed a FedEx truck, but he didn't. He could have robbed a UPS truck, but he didn't. He wanted to rob a Postal Service person, and he did it, and he did it twice. Isn't that enough to say he was looking for them? He wanted them, and it was on purpose. Why do we need to dig any deeper than that and say, well, it was really just for money? It does sound like you're saying it's got to be a particular kind of motive to get to this official role enhancement. It's not enough that he targeted this particular kind of target for his robberies. The problem with that argument, which the government made below, is it conflates the mens rea of acting knowingly or intentionally, intentionally targeting the male with motive. We instruct the jury, the very basic instructions, that acting knowingly, voluntarily, not by accident, is different from motive. Motive is why he did it. Yeah, yeah. I probably asked my question inartfully. You'd agree he did it intentionally. Everybody would say, yeah, he didn't stumble into this and accidentally pull out his fake gun and take money. He did it intentionally. There's no question about that. Your argument appears to be because he wanted money in the end, that's all that mattered. And what I'm trying to ask is, isn't it possible, and doesn't, in fact, the record support, rationally, the conclusion that he did want money, but he wanted it from this kind of person, a United States Postal Service employee, because he did it, and he did it in a specific way, and he did it twice. Isn't there a rational conclusion to be drawn from that? No, I disagree, Judge Jordan. And if we look at Hassan as an example, in that case, New York City police officers are surveilling Muslim Americans. They're intentionally targeting those people. But what this court says, the motive, why they did it, is national security post-9-11. There's a difference between intentionally targeting someone, which is the mens rea element, and the motive, the underlying reason why he did it. And I think here, if you go to the fact that he also took packages from porches, he also took $7 from the letter carrier. Well, he could do all kinds of other bad stuff. You know, maybe he's mean to his mother. What does that have to do with the fact that he's choosing, on more than one occasion, outfitting himself with a U.S. Postal Service sweatshirt and going out and finding these Postal Service people to rob him? Why isn't there an inference to be drawn that he wants to rob this particular kind of person, this official employee of the United States government? Well, those acts, those other acts matter. I can give you an example from the immigration context. If I come in and I say, I was persecuted. They conscripted me as a child soldier, and it was because of age. The government can respond and say they also conscript adults. This isn't because of age. They just want labor. And the same thing here, the fact that we can point to other examples where he's taking $7, where he's taking packages off of porches, that shows that he doesn't want packages. He wants a couple bucks for drugs, which is also in the PSR, in the acceptance section. He admits this is why I did it. I'm an addict, and I needed a couple dollars. The government has no case where there's a purely economic motive. They give us a pile of cases where there's impeding. You just put the rabbit in the hat there when you said a pure economic motive, because that's what you want the record to reflect, but maybe it reflects there's more than just a pure economic motive because of the way this happened. Let me ask my colleagues if they've got any further questions. Okay, we'll have you back on rebuttal, okay? Thank you. Good morning. May it please the Court. My name is Eileen Castilla-Geiger, and I represent the United States. I'd like to begin by addressing the district court's application of the official victim enhancement. The district court did not clearly err in applying this enhancement because the defendant was targeting postal workers based on their official status. How do we know that? Let's talk first about the text. You've got a problem with the text here because your argument seems to be knowledge, but the text speaks of motivation. Yes, that's correct. And motive may be inferred from knowledge of a victim's official status. Maybe, but is that what the district court really did here? Didn't the district court confuse the two? I don't believe so. Respectfully, I disagree with that analysis. So here the facts indisputably show that the postal worker, that the defendant was motivated by the postal worker's status because he targeted two postal workers on different occasions. And he targeted those postal workers to steal their packages in that U.S. mail matter. In the particular case in which the enhancement applied, the defendant approached the postal worker, he forced her back to her vehicle, and she was in a marked postal vehicle. Is there any reason to believe he wouldn't have done this to a UPS driver or an Amazon contract employee or someone else who had packages? So he might have done it to one of them, but those aren't the facts in this particular case. Here he targeted postal workers. Well, answer the argument we're getting from Ms. Horn that he also was stealing packages off of people's porches. He was the guy, he was stealing stuff. And when we say it's not the facts here, you know, we don't know what other kind of thefts he was doing. We know he stole from two postal service workers. But what the district court said was he knew exactly what he was doing. Answer that point that Judge Bibas has put to you. How do you get from the court saying he knew what he was doing to and now we know why he did what he was doing? Sure. So it's against those backdrop of facts, the facts that happened in this particular case, that the district court stated that he knew exactly what he was doing, that he knew that he chose his victims because they were postal workers and he was stealing postal packages. Give us some more about the because. Because it can't be that knowledge alone, just observing that somebody is a postal worker is enough for motive, right? I agree with that assessment, and, you know, I concede that. But here there was much more than knowledge. Here he targeted them to steal their postal packages, and the kidnapping was in order to successfully steal those packages. And the fact that he was wearing a uniformed USPS sweatshirt when he stole it. Packages. But that gets back to my Amazon. Is there any reason to think, you know, it was USPS people for a reason. It was different from, you know, their Amazon delivery or UPS. I mean, it doesn't seem tied to their official status. It's just Willie Sutton. Why rob the banks? That's where the money is. Why rob? Well, this person has packages. This person has packages. It doesn't seem tied specifically to the official status. Well, here it was tied to their official status, and the fact that he robbed not just one but two supports that. And back to the argument as to, well, maybe he was motivated by greed or financial gain. The official status need not be the sole motivation to find that the enhancement applies. As the Sixth Circuit said in the Sulik case. Well, don't we need to at least remand, because the district court used the words of knowledge, and the guideline uses the words of motivation. I don't think that we need to remand here for further factual findings. And the reason is that the district court didn't simply say the enhancement applies because the defendant knew they were postal workers. What the district court said was he knew exactly what he was doing. And at the sentencing hearing, the district court was responding to the government. Why don't you help us with the standard of review? What's the standard of review here of that language and the decision that the district court made? So the standard of review here is clear error. And Buford and Richards held that the- Oh, I mean, for the facts, certainly. But, you know, Chandler, for the legal understanding of the guidelines, isn't that de novo? Well, here this isn't a question of the legal understanding of the guidelines. Here what the district court did was it applied the guidelines enhancement to the facts of this particular case. And in Buford and Richards, the Supreme Court and the Third Circuit respectively held that when the district court is called on to apply an enhancement to a prescribed set of facts, even when they're not in dispute, clear error review applies. And more recently- Your argument is that motive is a question of fact. Motive boils down to, yes, it's a question of fact. And the factual question is, what was in the defendant's state of mind? And just last month, this court, the Third Circuit, in the Paris-Cologne case, it applied a clear error review standard to the district court's application of Section 2G2.1 of the guidelines. And in so doing, the Third Circuit explained, this is a highly factual inquiry. So it's fact-bound. And what you're telling us, I think, is the district court said enough that we should defer? Yes. But you'd agree that all the district court said was he knew exactly what he was doing here. And that the victims were in uniform at the time. How is that enough to get us from isn't there a legal issue around the scope of offense of conviction and what that allows a district court to consider, whether there should be a bifurcation of the motive for the kidnapping from just knowledge that flowed from a different motive that went with the robbery? And how do we infer that the district court had considered all of that and was actually making findings about a separate motive that went to the kidnapping? Well, so here the district court never rendered a legal conclusion. It applied the enhancement based on saying he knew exactly what he was doing, but this was based on the backdrop of facts. And it was in response to what the government... I'd have to say it is a legal conclusion, right? To apply an enhancement is a legal step. So I take your argument that this is a fact-bound decision, but at the end of the process, there's a legal determination. This enhancement will apply. And so the question Judge Krause is putting to you, I'd very much like to hear an answer to as well. How do you, even if we thought, oh, there's enough there to deal with robbery, what tells us that official position had anything to do with saying, now drive me a mile? Sure. Well, here the kidnapping and the robbery were inextricably intertwined. It was one fluid sequence of events. And this court has already determined the scope of conduct that may be considered, and I'd like to direct you to the Murillo and Pressler cases, which I think are directly on point to this issue. Okay. Then answer this from Pressler, from the famous footnote 7. The court quotes 1B1.3 and then says, significantly, this language suggests that not all acts or omissions committed or willfully caused by a defendant during the commission of offense are themselves part of the offense of conviction. That seems to be saying just because it's happening all at the same time is part of the offense of conviction, which I take to be saying you don't get to make the kind of argument you're making here, if I've read that right. How am I reading it wrong? Well, what the Pressler court also said was that several facts lead us to believe that the phrase offense of conviction includes the facts underlying the specific criminal offense for which the defendant was convicted. And here, the facts relating to the robbery undergird the kidnapping conviction. That's clear. These events took place at the same time and at the same place. And turning to the Murillo decision, which was quoted favorably in the Sims case in 2020 by the Third Circuit, you had asked Judge Jordan whether the Murillo case gained traction, and it did. And turning to that case, what the court held was that all conduct in furtherance of that offense may be considered. Well, their assertion is, and Ms. Horn pointed out there just a few minutes ago, is that the kidnapping, you might say the kidnapping was in furtherance of the robbery, but you can hardly say that the robbery was in furtherance of the kidnapping. It was the getaway for the robbery, not the other way around. Is that a distinction without a difference in your view? I mean, if we're going to say in furtherance of it, it wasn't like there was a kidnapping and, oh, by the way, give me your packages. It was, I'm stealing the packages, now help me get away. Sure. So respectfully, I disagree with your assessment, Judge Jordan. It's not my assessment. I'm trying to get you to answer her argument. Sure. Apologies. So here, the only reason that the defendant ended up in the victim's vehicle was because of the robbery. So, therefore, the robbery certainly furthered the kidnapping. The kidnapping wouldn't have taken place if the robbery hadn't occurred. Couldn't that robbery have been of anybody? It could have been off a porch, right? I mean, the kidnapping was a sort of getaway after the commission of a different offense. What is it about that getaway that itself independently shows that it was motivated by the status? Well, so here he was seeking to escape with the loot and escaping the kidnapping. Their point exactly. That's their point exactly. Well, just to give a hypothetical as to why. Say that, hypothetically speaking, this isn't obviously the case here. Here the kidnapping and the robbery weren't inextricably intertwined. But say that the robbery had never taken place. And the defendant had just kidnapped the postal worker and was using her car as a getaway vehicle for a totally unrelated crime. Here, the enhancement, the motivation behind the kidnapping, very well a reasonable judge could very well find that it was because of the victim's official status. And the reason is that a postal… Having the explicit, even saying that he knew exactly what he was doing, you know, suggests that at the minimum we need to remand and articulate the Pressler standard to have the court kind of focus in on whether this was specifically tied to the kidnapping. Well, here it was specifically tied to the kidnapping. A postal vehicle would afford a defendant more protection than, say, any getaway vehicle that was being used. Police are much less likely to stop a postal vehicle. Help us with that. Help us with that. Are you saying that with nothing in the record at all speaking to the targeting of the vehicle, that we should conclude that the reason Mr. Chandler kidnapped this particular victim was because he was going to feel safer or better in that kind of car? No, no. I was just saying that as a hypothetical. If we were to divorce the robbery for the kidnapping, the enhancement, a reasonable judge could find that the enhancement still… Those are not the facts here. I know, and I'm sticking with your hypothetical. I stick with your hypothetical. A reasonable judge, you're saying, just could assume that somebody trying to get a quick getaway, you know, could see three vehicles and say, I'm going with the Postal Service. They're an organ of the United States government. I'll be safer. What's the arc of reasoning that takes us to your conclusion? So, well, if the defendant, in such a hypothetical, knew that it was a government employee or official that he was then using for the vehicle, as numerous courts have held, motive can be inferred from knowledge of official status. And, for example, in the Bailey case, in upholding the district court's application of the enhancement, the circuit court quoted the district court's statement that he knew that she was a postmistress. But we established earlier, knowledge alone is not enough. So, a postal truck happened to come by. It could have been somebody just driving their car. What tells us that looking at that offense of conviction, of the kidnapping, that the district court made a thoughtful decision that this was motivated by status and didn't just leave the motive associated with the robbery, which, of course, made for knowledge that this happened to be a postal worker and postal truck, into the separate offense of conviction? Sure. So, here, the undisputed facts in the PSR and the ample evidence of the case, including which the government restated at the sentencing hearing, as well as the guilty plea colloquy, the facts there, too, they all establish these particular circumstances that show that the kidnapping was motivated by the victim's official status. The defendant approached his victim. That's a very general statement, so please be specific because you're, thank you, you're getting at what we're trying to find out. And if it's going to come back to the statement, the judge said he knew exactly what he was doing, we'll save some time and you can say that. But if there are other things, point us to what in the record would lead us to say, yeah, the kidnapping, that was done not because this person just was trying to get away, but because this was a postal worker. Sure. So, before the district court rendered its termination, the government explained at the sentencing hearing that the defendant was targeting postal workers because he knew that there would be objects that he could take from their postal trucks. And that was the basis upon which he chose them as his victims. In response to that. Bobbery. No, get us to the kidnapping. Well, the robbery and the kidnapping here are inextricably intertwined. You can't divorce the two. All right. The kidnapping. So, we're just going to have to agree to, you know, we understand your position on that. We're out of time, but I hope, with my colleague's indulgence, I do want to ask about the weapon here. Yes. It doesn't seem like you're defending this on the text. It doesn't seem like Post and Assyria did something on the commentary. Your defense is basically based on McLaughlin. That's correct. That is a one-sentence, third alternative holding interpreting the bank robbery statute, a different provision here. It seems kind of strained. You know, why shouldn't we, this isn't a criminal statute, why shouldn't we follow the text here? And this is not dangerous. It's only apparently dangerous. So, here you have to look at McLaughlin against the backdrop of what happened when the guideline enhancement was promulgated. The guideline enhancement here was promulgated just a year after McLaughlin, and the sentencing commission adopted the dangerous weapon enhancements, including the same term from McLaughlin in the guidelines. The commission was working off of that very recent definition when it incorporated that explicit definition of dangerous weapons. No, no, no. 2113D speaks of a dangerous weapon or device. They did not take that whole phrase. And maybe you can argue the unloaded handgun was a device. And an unloaded handgun could be used to pistol with people. But they didn't import it wholesale into the guidelines. So, I disagree with that. McLaughlin actually, the court in McLaughlin actually only used the term dangerous weapon. They never used the term dangerous weapon or device. And a replica firearm is encompassed directly by McLaughlin's definition. The Supreme Court held that one of the sufficiently independent reasons for finding that an unloaded handgun was a dangerous weapon is that it instills fear in the average citizen and that it creates an enhanced risk of a violent response. Is the government's position, so you embrace the majority's position in Tate that even a finger inside a pocket pointed at someone should qualify as a dangerous weapon? So, we're not called upon to determine that here because a replica firearm Should we adopt a broad ruling that goes as far as the Sixth Circuit? I don't think that the court necessarily has to do so here, but it certainly could based on the reasoning in Tate. I don't think that the court necessarily has to do that here because here a replica firearm is clearly a dangerous weapon. The word clearly is a substitute for analysis. Tell me, how can this weapon kill someone unless it's through the fear that a non-dangerous but mistakenly perceived as dangerous weapon does? Sure, so here as both victims stated after the fact, they feared for their lives as a result of the defendant's use of the replica firearm. It clearly instilled fear and it could have very well created an actual violent response because the defendant's use of the replica firearm, which he used to threaten his victims, he used it as a dangerous weapon. But the text says dangerous weapon. That's an argument that does not take us the provocation concern and covering a replica weapon. That seems to take us into the commentary. No, I don't think it necessarily needs to take us into the commentary because the commentary applies the very definition that's already in the guidelines text and the very definition that the Supreme Court applied in the McLaughlin case. So, I don't think that you need to even get to the guidelines commentary. Here, especially under these particular factual circumstances, the replica firearm was used as a dangerous weapon. The defendant treated it as such. His victims treated it as such. It clearly instilled fear in them. It could have led to a chain of events that very well could have led to violence. And so, under these particular— So, you are back to the finger in the pocket is the dangerous weapon  or the person who has a paper bag and says, I've got a bomb in the bag. The paper bag under your reading is a dangerous weapon. Sure. So, those would be. But here, a replica firearm is even more than those particular circumstances would qualify as a dangerous weapon, even more than a finger in the bag or than the other. And the reason is that a replica firearm looks just like an actual firearm. It's even more than a toy gun, for example. And numerous courts in the wake of McLaughlin, including this court in the Dixon case, found that even a toy gun qualified as a dangerous weapon under McLaughlin's definition. Okay. How can we say that on the basis of the text of the guideline that it's clear and unambiguous when it seems the commission itself, in its initial rendering of the commentary and in the Q&A that it put out, seemed to take the opposite interpretation than it does currently? Respectfully, I disagree, Judge Krause. And the Tate court addressed this very issue. And what the Tate court explained was that the Sentencing Commission, in its interpretation, was essentially codifying what was already in the guidelines and, by McLaughlin's definition, what numerous courts, both state and federal, had applied McLaughlin to encompass. And so the Sentencing Commission, in its interpretation, was not adding to or contradicting or expanding in any way what was already in the guidelines text. It was merely applying the definition that was already being used by state and federal courts. And that definition came from McLaughlin and its progeny. Didn't it contradict its own earlier interpretation of the term? Not necessarily contradict. I think it more per se just clarified how the federal and state courts were already applying McLaughlin. And the definition of McLaughlin clearly controlled here. And I think what the Sentencing Commission, as I mentioned, was doing was it was merely codifying what was already the understood interpretation of a dangerous weapon. And I think the Tate court, the Sixth Circuit gave a very fulsome explanation of why the Messier and Kaiser line of cases do not apply here. Okay. Thank you. Thank you very much. Respectfully, I ask that this court affirm the district court's judgment. Thanks, Ms. Geiger. Ms. Horn on rebuttal. Thank you. On issues two and three, the definition of dangerous weapon, I don't hear the government making any argument from the text. I don't hear the government refuting the history of the commentary. Indeed, this court in Dixon in 1992 said that the commentary was an expansion. Actually, this court used that word. And we now know in Messier that that's not okay. You want to address the argument that when the Supreme Court makes a ruling, as it did in McLaughlin, that then the language becomes a term of art. And now dangerous weapon means exactly what the Supreme Court has said it meant in McLaughlin, and people should understand that. Right. That's the prior construction canon. And it doesn't apply here, because as Judge Bibas asked the government, they used a different phrase. In 1934, Congress added the words or device to the armed bank robbery statute because they were concerned that dangerous weapon wouldn't encompass a wooden gun. When the guidelines chose to use a phrase here, they used only dangerous weapon. They did not include or device. So it's the lack of the word or device that does it for you. I think that's critical, because in McLaughlin there's an unarmed firearm. All right. But McLaughlin didn't talk about the unloaded firearm as being a device. They just have talked about it as a dangerous weapon. Right. It presupposes that it's a weapon. So when we talk about instilling fear, you have something that's already a weapon, a hand in the pocket, a paper bag, a fake gun. These aren't weapons. Instilling fear only goes to dangerousness if you have something that's already a weapon. In footnote 3, critically, they refer to the wooden gun as an apparently dangerous weapon. How about an inoperable weapon? How about a – would you say the same thing if it wasn't just unloaded, but it didn't have a firing pin? Yeah, that's already a weapon, and that could be used as a bludgeon. Well, so can a replica gun, right? The replica gun could be used as a bludgeon. You could have pistol-whipped them with it, couldn't you? Well, no, we don't know that, Judge Jordan. The government has never contended that. It could be plastic or foam or rubber. Well, you're not suggesting it was a nerf gun, are you, like it was made out of foam? It was a replica of a gun, which was believable enough that people were in fear for their life. So your acknowledgement that, you know, a gun without a firing pin would still be a dangerous weapon because you could bludgeon, that applies just as much to a replica gun, doesn't it? So the government would have to make a record of that. We know what it looked like on the outside. We have no idea what it was made out of. Okay. Can you please respond to – and this is back to Murillo, this language from Murillo, which relies in turn on our decision in Inigo. It says, a court should look both to the acts or omissions of the defendant that satisfied the specific elements of the offense of conviction and to those that brought about the offense of conviction, all acts and omissions that were in furtherance of the offense of conviction. When we said and to those acts or omissions that brought about the offense of conviction, doesn't that sweep in then to the kidnapping offense, all the stuff that was happening with the robbery? I think when the court in Murillo uses in furtherance, they're explaining that they don't mean brought about in the sense of a chronology. You know, this is what he had for breakfast, and then this happened and this happened. They mean what acts were in furtherance of the kidnapping. Okay. Well, that seems to be undermined by the quote from Inigo, which precedes the language I just gave you. The quote from Inigo that we were relying on in Murillo says, under our approach, the offense includes the offense charged as well as the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense. In other words, when I read that, it seems to be saying the stuff that brought about the offense of conviction is part of what you're to look at. Am I misunderstanding that? You know, I think the in furtherance language is really important here, because otherwise we're getting into relevant conduct lands, course of conduct, that sort of thing. Okay. All right. Well, thank you very much. Appreciate the argument from both sides. We've got the case under advisement, and we'll call our next case. Thank you.